Zuhair Mahmoud
5243 10th Pl S
Arlington, VA, 22204-3208
571-214-5514
zuhair@accesstojobs.com

UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Zuhair Mahmoud,<br><br>    Plaintiff,<br><br>vs.<br><br>Library of Congress<br><br>And<br><br>Dr. Carla Hayden, Librarian of Congress, In Her Official Capacity, and<br><br>Bernard (Bud) Barton, Chief Information Officer, In His Official Capacity<br><br>Serve On:<br><br>Office of the General Counsel<br><br>The Library of Congress<br><br>101 Independence Ave., S.E.<br><br>Washington, D.C. 20540-1050<br><br>    Defendant(s) | Case No.: No. _____<br><br>COMPLAINT<br><br>Case: 1:20-cv-01935<br>Assigned To : Boasberg, James E.<br>Assign. Date : 7/15/2020<br>Description: Employ. Discrim. (H-DECK) |

Plaintiff Zuhair Mahmoud, representing himself, files this complaint against Defendant Carla Hayden in her official capacity as Librarian of Congress, and Bernard (Bud) Barton in his official capacity as the Chief Information Officer (CIO) of the Library of Congress for violating

Summary of Pleading - 1

federal anti-discrimination laws that require the federal government to provide equal opportunity to people with disabilities. He alleges as follows:

## I. INTRODUCTION

1. Plaintiff Zuhair Mahmoud is an Information Technology Specialist who is blind. He has worked at the Library of Congress in the Office Of The Chief Information Officer (OCIO) (formerly Information Technology Services (ITS)) since 2010, and uses a screen reader to access his computer.

2. In 2015, the Library of Congress purchased and installed a sharing and collaboration platform from a company called Atlassian (herein referred to as the Atlassian Platform) consisting of two applications: Confluence and Jira, which are not compatible with his screen reader software. The platform is the primary business tool for OCIO: the repository where OCIO's business is stored and where projects are tracked to the smallest details.

3. Defendants ignored the recommendation of its own team of accessibility experts, the experience of other agencies and the vendor's stated lack of interest in making the product accessible to work with screen readers. Defendants did not evaluate any other products for accessibility or business suitability.

4. Despite plaintiff's repeated requests for reasonable accommodations over a 5 year period, the latest being February 19, 2020, defendants repeatedly declined his requests.

5. In what appears to be a retaliation against plaintiff for not supporting the organization's adoption of the Atlassian Platform, otherwise considered a crowning achievement for the CIO, defendants took away plaintiff's responsibilities, assigned him to a team in a

different building without the necessary tools to work with his colleagues and left him with very little meaningful work.

6. As a result of ongoing use of technology not compatible with his screen reader, defendants denied Mr. Mahmoud equal access to information, interfered with his ability to do his job, denied him reasonable accommodations, precluded him from any potential for promotion, and discriminated against him on the basis of his disability.

7. On March 18, 2020, plaintiff filed a complaint with the Office of Congressional Workers' Rights (OCWR) pursuant to § 402 of the Congressional Accountability Act Reform Act (The Act), 2 U.S.C. § 1402. The preliminary review pursuant to § 402(a), 2 U.S.C. § 1402(a) was completed and the report was transmitted to OCWR on April 13, 2020 (Refer To Exhibit I, REPORT ON PRELIMINARY REVIEW).

8. On April 18, 2020, parties engaged in voluntary mediation pursuant to § 403 of the Act, 2 U.S.C. § 1403, and mediation concluded without a resolution on June 17, 2020 (Refer To Exhibit II, END OF MEDIATION NOTICE).

9. Plaintiff therefore wishes to exercise his right under § 401(b) of the Act, 2 U.S.C. § 1401(b) to file civil action in District Court, making this matter ripe for judicial review.

II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 2 U.S.C. § 1408 for Plaintiffs' claims arising under §§ 201, 207(a), 210(a) and 210(b) of The Act, 2 U.S.C. §§ 1311, 1317(a), 1331(a) and 1331(b), and pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under § 501 of the Rehabilitation Act of 1973 ("Section 501") 29 U.S.C. §§ 791.

11. Plaintiff is a resident of Arlington, Virginia and is employed full time in the District of Columbia.

12. Defendant's primary place of business is located at 101 Independence Ave. SE in Washington, D.C, 20540, where the Library of Congress is located.

13. The acts and injuries complained of herein occurred in Washington, D.C.

14. Venue in this Court is therefore proper pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this district and because acts constituting above violations occurred in this district.

III. THE PARTIES

15. Plaintiff Zuhair Mahmoud has been an Information Technology (IT) specialist for his entire career, and has worked at the Library of Congress for the past ten years. Blind since birth, he immigrated to the United States on his own at the age of 17 to pursue his life long dream of a career in Information Technology. He attended his senior year of high school in Chelmsford MA, where he crammed three years worth of Math and Science in one year, and went on to attend college at Florida Atlantic University in Boca Raton, FL, and later moved to the Metropolitan State College of Denver. He started his career working for a small tech company in Denver that sold and customized computers for people who are blind, and then went on to work for GTE, IBM and ran his own consulting business for a few years. In 2001, and prior to joining the Library, Zuhair cofounded Nattiq Technologies, which went on to produce the first fully integrated screen reading, magnification and braille output program in Arabic.

16. As a blind computer user, Zuhair uses screen access software that converts digital information to synthesized speech. The brand of screen access software Zuhair uses is called "JAWS For Windows (JFW)," which stands for Jobs Access With Speech, and is an "assistive technology" that can read aloud information presented on a computer screen. (http://www.freedomscientific.com/products/fs/jaws-product-page.asp, last retrieved at 7:51 PM on July 6, 2020). JAWS can read text in documents, websites, e-books, and other formats provided they are written in a way that complies with modern accessibility standards created by the World Wide Web Consortium (W3c) (also known as the Web Content Accessibility Guidelines (WCAG) 2.0 AA), adopted by the International Organization for Standardization as ISO/IEC 40500, and incorporated by reference in 36 C.F.R. 1194.1, the implementing regulations for Section 508 of the Rehabilitation Act, 29 U.S.C. § 794d. Various jurisdictions in a variety of court cases recognized these standards as the acceptable measure of determining the accessibility (or lack thereof) of software and web sites.

17. The Library of Congress is the largest library in the world, with millions of books, recordings, photographs, newspapers, maps and manuscripts in its collections. The Library is the main research arm of the U.S. Congress and the home of the U.S. Copyright Office. Dr. Carla Hayden was sworn in as the 14th Librarian of Congress on September 14, 2016. Hayden, the first woman and the first African American to lead the national library, was nominated to the position by President Barack Obama on February 24, 2016, and her nomination was confirmed by the U.S. Senate on July 13 of the same year.

18. The Office of The Chief Information Officer (OCIO) is the principal Information Technology organization in the Library, and plays a central role in the procurement, provisioning, development and support of the Library's technology infrastructure and digital initiatives. Bernard (Bud) Barton is the Library's Chief Information Officer, and is responsible for all decisions related to Information Technology at the Library. Mr. Barton took up his position at the Library after Labor Day in 2015, after a widely publicized critical GAO report of an audit of the Library's Information Technology management practices. The fallout from the report led to a major shake-up in the Library's management and the retirement of the previous Librarian of Congress, Dr. James H. Billington).

IV. STATEMENT OF FACTS

19. Plaintiff started working at the Library of Congress on October 25, 2010 as a Lead Information Technology Specialist in the Technology Assessment Group (TAG).

20. On March 22, 2015, plaintiff was given the position of the Adaptive Technology Demonstration Center (ATDC) program manager, serving as the Library's subject matter expert on the accessibility of Information Technology.

21. Ever since his initial appointment, plaintiff consistently maintained either an outstanding or an excellent performance rating, and was recognized during his first year with a Quality Step Increase (QSI).

22. In 2015, the Library started deploying the Atlassian platform for use by OCIO staff. The platform would serve as the primary business tool for OCIO where all documents are stored, plans are communicated and projects are run. In a typical OCIO meeting,

participants would often use the platform to go through outstanding issues, record new issues and update existing ones, and all project deliverables, meeting notes and related documents would be stored there.

23. It is safe to say that there is not an area in OCIO that does not rely on the Atlassian Platform for its function.

24. In October of 2015, OCIO management asked plaintiff, in his professional capacity as the Library's subject matter expert on IT accessibility, to assist the project team in charge of deploying the Atlassian platform to evaluate its accessibility and its compatibility with assistive technology in general, and the JAWS screen reader in particular, since it was understood that plaintiff, just like the rest of OCIO staff, would be expected to use the platform once it is deployed.

25. Although JAWS and other screen readers read everything that is on a computer screen, there are ways in which technology must be made compatible with them. For example, images or internet links must have alt-text "descriptions" for JAWS (or any other screen reader) to be able to read them to the blind user. Unless these descriptions are included, the screen reader cannot discern the content of the links or images. Special tags, known as ARIA attributes, may need to be included to ensure that elements on the screen appear where they should, and announce their label and their status. Incorrect use of such tags can have severe consequences, including rendering a screen reader incapable of knowing whether a screen element even exists.

26. In addition, because blind computer users cannot use a computer mouse to "click" on buttons or links, websites, web applications, and software must be designed to allow blind users to move through a document or a website and to activate links or buttons,

highlight text, and perform other functions using keyboard controls rather than a computer mouse.

27. As part of their research, the project team conducted preliminary testing with a screen reader, which exposed a variety of severe accessibility problems, rendering the platform completely unusable with any screen reader.

28. The team then turned to the vendor's documentation, and found that the accessibility issues were indeed well documented in the vendor's VPAT hosted on their web site.

29. The team then communicated with other Federal agencies who have had prior experience with the platform.

30. The Department of Homeland Security's Office of Accessible Systems (OAST) provided the team with an extensive written evaluation of the platform, concluding that it is "not conforming, has significant accessibility concerns, and without paying for specific supplemental support remediation is not as clearly nailed down as it should be unless an agency accepts responsibility of remediating and sharing solutions with open source community as a good partner should."

31. An agency who did just that was the Office of Management And Budget, who met with several members of the project team on February 3, 2016. OMB dedicated up to four Full Time Equivalent (FTE) and spent tens of thousands of dollars over several years, but were not able to bring the platform into compliance.

32. Based on the above, the then director of Web Services, Jim Karamanis, emailed the CEO of Atlassian, the Australian vendor who makes the platform, and was told in an email that, "… we don't have a near-term timeframe for fully testing against 508 or WCAG standards. We see this as the most viable strategy for us currently considering the other

requirements that the product has and our other strategic goals". We later learned that other Federal agencies at the time received a similar response.

33. The project team submitted a report to OCIO management which concluded that: 1. The platform is inaccessible out of the box. 2. Attempts by other agencies at making it accessible have been arduous and expensive, and have not managed to bring it into compliance with minimum accessibility standards. 3. The vendor indicated that they have no timeline for fixing the accessibility issues as accessibility is not currently a big part of their strategy, and 4. This is a good time to look at alternative products, before it becomes too costly to do so.

34. On February 3, 2016, plaintiff personally met with Bud Barton, the Chief Information Officer, and informed him of his concern about the inaccessibility of the proposed tools and their impact on his ability to perform the essential functions of his job and the ability of the Library to provide reasonable accommodations to him and other current and future employees. Plaintiff advised, and Mr. Barton concurred, that there are other tools that could do the job that could provide more accessibility. Upon Mr. Barton's request, plaintiff followed up with an email documenting his concerns on the following day. Mr. Barton did not respond to plaintiff's February 4 email, and plaintiff later learned that defendants decided to proceed with the deployment of the Atlassian platform despite it not being usable by plaintiff and other people with disabilities.

35. In late March of 2016, the project team was asked to evaluate an accessibility add-on that claimed to make Confluence, one of the two tools comprising the Atlassian platform, compatible with screen readers including JAWS. Upon examination, The project team concluded that the add-on merely removed the inaccessible parts of the application, many

of which formed core indispensable features, and modified others by stripping down much of their functionality. Most importantly, the add-on did not address the critical accessibility defects identified and documented by the vendor, the Library, and other Federal agencies, and the few issues it addressed were only limited to Confluence, which left the issues in Jira, the other part of the Atlassian platform, unaddressed.

36. Despite the recommendation not to purchase the add-on, defendants proceeded to purchase and install the add-on anyway.  no further discussion of the accessibility of the Atlassian platform took place, with everyone accepting the fact that the Library purchased and deployed an enterprise wide product knowing that it cannot be used by people with disabilities, including plaintiff.

37. Plaintiff then brought up the issue of the inaccessibility of the Atlassian platform to the attention of the Library's director of the Office of Employment and Equal Opportunity And Diversity Program (EEODP) and the Library's ADA coordinator in subsequent conversations, but nothing became of those discussions.

38. Since 2016, much of the Library's Information Technology related work was migrated to and is being conducted using the Atlassian platform, with plaintiff's access to essential information needed to do his job quickly and vastly diminishing.

39. On October first, 2018, as part of a comprehensive reorganization of the Office of The CIO (OCIO) known as Phase 2.0, the Technology Assessment Group (TAG), where plaintiff worked, was disbanded, the Assistive Technology Demonstration Center he managed was given to a different team,, and plaintiff was reassigned to the Quality Assurance (QA) and Testing team located in a different building.

40. Shortly after the reorganization and on his own initiative, plaintiff met with his then new acting supervisor to discuss his new assignment. He was told, as all OCIO staff were, to "continue doing what you are doing", without any further direction or clarification.

41. Indeed, OCIO management continued to repeat and publicized the mantra that the reorganization was merely a paperwork exercise, and that they expected everyone to continue doing what they have been doing before; despite the fact that their position descriptions (PD's) were (and are to this day) not updated, their organizations have changed, their original teams have been split, their budgets have been taken away and they were reporting to new supervisors many of whom were acting and had no familiarity with the individual or the team's function.

42. The new supervisor indicated to plaintiff that he expects him to document his work using the Atlassian platform, and when plaintiff brought up the accessibility issues and the need for reasonable accommodations, the supervisor, after concurring with OCIO management, responded that "we are planning to upgrade to a newer version, and hopefully that would be more accessible". Plaintiff was not aware of any active investigation by defendants of the accessibility improvements (or lack thereof) in the "future upgrade". In fact, plaintiff's own investigation indicated that there were more accessibility issues with the upgrade.

43. Due to the lack of direction, lack of a job description, the inaccessible technology which plaintiff could not use, and the remaining team members being located in a different building, plaintiff became quickly isolated from the rest of the team and virtually dependent on others for much of his work.

44. On February 19, 2020, plaintiff was informed of yet another reassignment, this time to the Design and User Interface (UX) group, a group which is responsible for the visual design of a web site or a program. Their deliverables tend to be drawings, wireframes and mockups depicting what the web site or programs would look like – hardly a fit for a blind developer with a background in programming and accessibility.

45. Plaintiff met with both his new supervisor as well as her boss, the chief of IT Design And Development (D&D), where he was told to "continue to do what he was doing" in the short run, but to expect changes in the long run. He was told that indeed the new team will continue to use the Atlassian platform as their primary tool. When bringing up the inaccessibility of the platform, plaintiff was told there was nothing defendants could do.

46. Since 2016, the number of projects plaintiff has been involved in significantly decreased, and his involvement in projects became less meaningful. Colleagues would sometimes convert items to a format plaintiff can read, but only when his input was necessary. Plaintiff could no longer proactively participate in a project the way he needed to. As the use of the Atlassian platform spread, team meetings centered on the platform's content, and it ultimately became the driver for most meetings, and the place where knowledge and action items resulting from those meetings are stored.

47. Plaintiff was put on a team located in a different building than the rest of his colleagues and attempts by his supervisor to move him were blocked. Along with inaccessible tools, this led to a near complete physical and virtual isolation from the rest of the team.

48. Plaintiff was deliberately excluded from team meetings, team training and relevant discussions about Accessibility at the Library, a subject he is supposed to be the authority

on. Plaintiff contends that this is due to his outspokenness about the inaccessibility of the Atlassian platform and his repeated requests for reasonable accommodations.

49. During this period, plaintiff suffered significant physical and mental anguish characterized by regular illness, severe migraines, loss of sleep and other significant health issues which caused him to miss work on many occasions and to go on FMLA in late 2018.

50. The decision to use the Atlassian platform despite the full knowledge of its accessibility issues, and the lack of consideration of other functionally equal (or possibly superior) alternatives that are more accessible, and that could still meet the other organization's business requirements, was a completely avoidable, capricious and arbitrary discriminatory act.

V. SUMMARY OF VIOLATIONS

Violation of Section 501 of the Rehabilitation Act – Failure to Accommodate, 29 U.S.C. § 791, and violations of §§ 201, 210(a) and 210(b) of the Congressional Accountability Act Reform Act, 2 U.S.C. §§ 1311, 1331(a) and 1331(b),

51. Plaintiff incorporates by reference all the allegations of facts maintained in the previous paragraphs.

52. Because he is blind, Plaintiff is an individual with a disability.

53. The Library had notice of plaintiff's disability and has, at times, provided him accommodations because of that disability.

54. The Library failed to provide plaintiff with reasonable accommodations on at least three occasions: in 2016 when the platform was initially installed, in 2018 when he was

reassigned to the QA team, and in 2020 when he was assigned to the UX And Design team.

Violation of § 207(a) of The Congressional Accountability Act Reform Act, 2 U.S.C. § 1317(a).

55. Plaintiff incorporates by reference all the allegations of facts maintained in the previous paragraphs.

56. Sidelining plaintiff, taking away his duties, disinviting him from team meetings and excluding him from participating in discussions within his area of expertise is a direct retaliation for his outspokenness about the inaccessibility of the Atlassian platform.

WHEREFORE, Plaintiff respectfully requests that this Court:

57. Declare that, as a result of conduct described herein, the Defendant has intentionally violated Plaintiff's rights under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, and 201, 207(a), 210(a) and 210(b) of the Congressional Accountability Act Reform Act, 2 U.S.C. §§ 1311, 1317(a), 1331(a) and 1331(b).

58. Grant a permanent injunction enjoining Defendant from a) continuing to use the Atlassian platform; b) continuing to purchase inaccessible software and hardware, especially if it is to be used throughout the organization; and c) from engaging in any other employment practices that discriminate on the basis of an employee's disability;

59. Award Plaintiff all damages to which he is entitled including, but not limited to, all special, general, compensatory, punitive, exemplary, or other damages pursuant to § 201 of the Congressional Accountability Act Reform Act, 2 U.S.C. § 1311 or as otherwise authorized by law.

60. Award Plaintiff such further relief as the court deems necessary and proper in the public interest.

Dated this 14rth day of July, 2020

s/ Zuhair Mahmoud, Pro Se
5243 10th Pl S
Arlington, VA, 22204-3208
571-214-5514